IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CEDRIC LAMONT ROBINSON,

Defendant.

CRIMINAL CASE NO.

1:11-CR-0251-JOF-JFK

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Cedric Lamont Robinson's motion [Doc. 9] to suppress evidence and motion [Doc. 10] to suppress statements. An evidentiary hearing was held on the motions on August 24, 2011.[1] Following the hearing, Defendant filed a brief in support of his motion to suppress evidence; however, he did not address in any manner the motion to suppress statements.[2] [Doc. 20]. The court finds that Defendant abandoned any challenge to the admissibility of the statements when he failed to mention the statements in his post-hearing brief. See United States

---

[1]Citations to the hearing transcript are: (Tr. at ).

[2]The title of Defendant's brief, "Defendant's Post-Hearing Brief in Support of Motion to Suppress Evidence," makes it clear that he intended not to address the motion to suppress statements. [Doc. 20].

v. Zekic, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing Access Now,

Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by

now well settled in this Circuit that a legal claim or argument that has not been briefed

before the court is deemed abandoned and its merits will not be addressed.")), adopted

by 2010 WL 4967825 (N.D. Ga. December 1, 2010).

Moreover, testimony introduced at the evidentiary hearing established that

suppression of Defendant's statements is not warranted.[3]  The statements made by

Defendant to Officer Taneshia Sims are admissible as spontaneous and volunteered

statements that were not the result of interrogation or the functional equivalent of

interrogation. (Tr. at 33-35). See Rhode Island v. Innis, 100 S. Ct. 1682, 1689-90

(1980); United States v. Sanders, 315 Fed. Appx. 819, 823 (11th Cir. 2009)

("'Voluntary and spontaneous comments by an accused . . . are admissible evidence

if the comments were not made in response to government questioning.'") (quoting

Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991)). Defendant's statements made

to Task Force Officer ("TFO") Kenneth Fisher with the Bureau of Alcohol, Tobacco

and Firearms ("ATF") are admissible because Defendant voluntarily, knowingly and

---

[3]The circumstances surrounding Defendant's statements are set forth in the
statement of facts *infra*.

2

intelligently waived his rights verbally and by signing a waiver of rights form, after being advised of <u>Miranda</u> rights. (Tr. at 70-75, Gov't Ex. 3). <u>See</u> <u>United States v. Beckles</u>, 565 F.3d 832, 839-40 (11th Cir. 2009); <u>Hart v. Attorney General of the State of Florida</u>, 323 F.3d 884, 893 (11th Cir. 2003); <u>see also</u> <u>United States v. Guerrero</u>, 296 Fed. Appx. 764, 766-67 (11th Cir. 2008) (court found that the defendant's waiver was valid based upon evidence that he was presented with Spanish rights form, that his rights were explained to him in Spanish, that he stated he understood his rights, and that he initialed and signed waiver form); <u>United States v. Mauleon</u>, 5 Fed. Appx. 782, 784 (9th Cir. 2001) (despite the defendant's claim to the contrary, the court found that the defendant understood his rights because he "stated he understood the rights, appeared to read the Spanish waiver of rights form and signed the written waiver"); <u>United States v. Boon San Chong</u>, 829 F.2d 1572, 1573-74 (11th Cir. 1987) (facts indicating that the defendant was given a <u>Miranda</u> rights form and waiver in his native language, had stated that he understood his rights and had answered questions after reading the form supported a finding of knowing and intelligent waiver of rights). For these reasons, court **RECOMMENDS** that Defendant's motion [Doc. 10] to suppress statements be **DENIED**.

3

With respect to the motion to suppress evidence, Defendant argues in his post-hearing brief that the officers who conducted the warrantless search of his residence on December 13, 2010, did not have reasonable suspicion to support the search. [Doc. 20]. As a result, according to Defendant, the evidence seized from the residence, two firearms, should be suppressed as fruits of the unlawful search. [Id.]. The Government opposes the motion to suppress arguing that no suspicion was required for the search because Defendant had a lack of expectation of privacy as a parolee and because he expressly agreed to warrantless and suspicionless searches under the terms of the parole certificate. [Doc. 21, Gov't Ex. 1]. In support of its argument, the Government cites the Supreme Court decision in Samson v. California, 126 S. Ct. 2193 (2006). The Government also contends that even if reasonable suspicion was required for the search, the circumstances gave rise to reasonable suspicion of criminal wrongdoing that justified the search. [Doc. 21]. Accordingly, the evidence seized from the search should not be suppressed. [Id.].

Based on a review of the totality of the facts established at the evidentiary hearing and applying binding and persuasive legal authority, the court recommends that Defendant's motion to suppress be denied.

4

## I.    Facts

On or about September 30, 2009, Defendant Cedric Lamont Robinson, who had been convicted of various State of Georgia felony drug offenses, robbery by intimidation, and possession of a firearm by a convicted felon, was released from prison and placed on parole. (Tr. at 5-8; Gov't Exs. 1 and 2). Defendant met with Parole Officer ("PO") Shekevia Hawkins on October 1, 2009, in the North Fulton Parole Office. (Tr. at 5-6, Gov't Ex. 1). PO Hawkins informed Defendant of the reporting instructions for the Parole Office and reviewed the contents of the parole certificate. (Tr. at 6-11, Gov't Ex. 1). The parole certificate listed the effective parole date as September 30, 2009, and the expiration date as November 15, 2015. (Gov't Ex. 1). Defendant provided the residence of his wife, Tabitha Robinson, 1888 Joseph E. Boone Boulevard, Atlanta, as his parole residence. (Tr. at 7, Gov't Ex. 1).

PO Hawkins reviewed with Defendant the special conditions of parole provided on the first page of the parole certificate. (Tr. at 8, Gov't Ex. 1). The paragraph containing the special conditions read as follows:

> IN ACCORDANCE WITH INSTRUCTIONS ISSUED TO ME BY MY PAROLE OFFICER, I WILL PAY $30.00 PER MONTH TO THE GEORGIA CRIME VICTIMS EMERGENCY FUND. I will be placed on ELECTRONIC MONITORING immediately upon release. I understand that I will be required to pay for this service. I will receive

5

> SUBSTANCE ABUSE ASSESSMENT and follow through with any
> recommendations made, until my parole officer or chief authorizes
> termination. Additionally, I agree to pay all of the costs of substance
> abuse counseling. YOU ARE BANISHED FROM CARROLL
> COUNTY.

(Gov't Ex. 1). PO Hawkins then reviewed with Defendant the standard conditions of

parole specified on the second page of the parole certificate. (Tr. at 8-11, Gov't Ex.

1). Six standard conditions were listed, and PO Hawkins read each one to Defendant.

(Id.). Among the standard conditions of release on parole, Defendant Robinson agreed

that he "will not violate the law of any governmental unit[;]" agreed not to possess any

type of firearm, ammunition or deadly weapons; agreed not to leave his state of

residence or change his address without first getting permission from his parole officer;

and agreed that, if he was unable to maintain employment, he would return to school.

(Tr. at 8-10; Gov't Ex. 1). Defendant also agreed to the following standard condition:

"My parole officer or any other parole officer may, at any time, conduct a warrantless

search of my person, papers, and place of residence, automobile, or any other property

under my control." (Tr. at 9, Gov't Ex. 1). Defendant did not object to or refuse to

abide by any of the conditions, and he did not ask any questions regarding the

condition addressing searches. (Tr. at 10, Gov't Ex. 1).

6

PO Hawkins then reviewed with Defendant the acknowledgment and certification portion of the parole certificate. (Tr. at 10, Gov't Ex. 1). Defendant signed the acknowledgment of conditions of release which provided in part, "I have read or have had read to me the above standard Parole conditions[.]"[4] (Tr. at 8-11, Gov't Ex. 1). The signing of the acknowledgment by Defendant was witnessed by PO Hawkins, who signed the document as the institutional official. (Id.). PO Hawkins testified that Defendant appeared to understand her questions and what she read to him from the parole certificate and that he appeared responsive to her questions. (Tr. at 11). Defendant did not slur his speech or appear to be under the influence of drugs or alcohol. (Tr. at 11-12). PO Hawkins did not threaten Defendant, promise him anything in exchange for signing the certificate, or touch him. (Tr. at 12-13).

The Board of Pardons and Paroles Field Operations Manual is a set of policies that parole officers should follow in supervising parolees. (Tr. at 15-16, Def. Ex. 1). The part of the manual covering searches provides that "[t]he search of a parolee's 'person, papers, place of residence, automobile or any other property' should be conducted only after 'reasonable suspicion' have been established." (Tr. at 16, Def.

_____

[4]If a parolee refuses to agree to and execute the certificate and conditions of release, he or she is returned to custody. (Tr. at 12).

Ex. 1). The manual also provides, "The Chief Parole Officer or designee must approve and coordinate any search with the exception of a Stop and Frisk search and searches incident to arrest." (Id.).

While Defendant was on parole, he tested positive for illegal drug use on at least three occasions. (Tr. at 41-43, Gov't Ex. 2). Of the three positive drug tests, the last one occurred in October 2010. (Tr. at 42-43). In or around June 2010, Defendant changed his residence of record without permission from his parole officer. (Tr. at 25). Defendant received a verbal reprimand and was allowed to remain at the new residence of record, which was Apartment A-1 at 50 Mt. Zion Road in Atlanta. (Tr. at 24-25). Although Defendant was responsible for paying a parole supervision fee of $30 per month, records reflect that he failed to pay the fee in the amount of $180 and that he last paid the fee in February 2010. (Tr. at 44, Gov't Ex. 1). Defendant also had been referred to a substance abuse program but failed to complete treatment in the program. (Tr. at 44-45, Gov't Ex. 2). In October 2010, approximately a year after Defendant was released from prison and placed on parole, PO Taneshia Sims began supervising Defendant when he was transferred to her caseload. (Tr. at 22).

On December 13, 2010, PO Sims conducted a "detail" of her parolees that lived in Zone 3 of Atlanta. The detail was conducted with other officers from the Georgia

Board of Pardons and Parole, the Department of Corrections, and the Atlanta Police Department ("APD"). (Tr. at 23-24). During the detail, the officers served outstanding warrants and conducted compliance checks with parolees. (Id.). PO Sims testified that prior to the detail, her supervisor, Chief Felicia Holloway, approved of officers conducting searches of the parolees' residences. (Tr. at 45-46).

When the officers arrived at the residence of Defendant Robinson, Apartment A-1 at 50 Mt. Zion Road in Atlanta, PO Sims was in the lead and knocked on the window of his apartment. (Tr. at 26). When Defendant asked who was at the window, PO Sims identified herself, and Defendant unlocked and opened the exterior door. (Id.). Approximately five uniformed officers, including PO Sims, stood at the door, and PO Sims informed Defendant that they were conducting compliance checks. (Id.). PO Sims informed Defendant that the officers were going to search his bedroom. Defendant did not object to the search and pointed to the back of the residence stating, "My bedroom is straight back." (Tr. at 27-29). When the officers entered the residence, PO Sims instructed Defendant to have a seat in the living room while the other officers conducted a search of his bedroom. (Tr. at 52-53). Defendant sat down in the living room, and PO Sims stayed with him there while the other officers searched his bedroom. (Tr. at 26, 52-53).

9

AO 72A
(Rev.8/82)

During the search of the Defendant's bedroom, officers discovered two firearms under two different pillows on the bed. (Tr. at 30). The officers also discovered ammunition in a bag inside of the bedroom closet. (Id.). After the ammunition and firearms were discovered, one of the officers in Defendant's bedroom called out to PO Sims, who walked back to the bedroom. (Id.). PO Sims then called APD Officer Harris, who was outside of the residence. (Tr. at 31). Officer Harris entered the apartment, examined the evidence recovered from the bedroom, and asked PO Sims about Defendant's history. (Id.). Handcuffs were placed on Defendant after the firearms were found and Officer Harris was called in. (Tr. at 56). Officer Harris then contacted ATF TFO Fisher. (Tr. at 31).

After TFO Fisher arrived at the residence, he and Officer Harris interviewed Defendant in his aunt's bedroom. (Tr. at 32, 67-68). Defendant sat in the one of the chairs, and TFO Fisher introduced himself and showed Defendant his credentials. (Tr. at 67-69). TFO Fisher testified, "I advised him I was there because firearms were recovered and he was a felon." (Tr. at 68-69). TFO Fisher then asked Defendant if he wanted to speak to him, and Defendant responded affirmatively. (Tr. at 69). The TFO advised Defendant of his Miranda rights using an ATF advice of rights and waiver form. (Tr. at 69-71, Gov't Ex. 3). Defendant was advised:

10

You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins. If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

(Tr. at 69-71, Gov't Ex. 3). After he read Defendant the warnings, TFO Fisher asked Defendant, "Do you understand these rights and do you wish to speak to me at this time without a lawyer?" (Tr. at 72). Defendant answered "yes" to both questions. (Id.). TFO Fisher then had Officer Harris remove Defendant's handcuffs. (Tr. at 69-70). The TFO reviewed with Defendant each of the Miranda rights again, and Defendant initialed each right listed on the form. (Tr. at 70, 72, Gov't Ex. 3). TFO Fisher placed his initials and the time he read the form to Defendant in the middle of the page. (Tr. at 72-73, Gov't Ex. 3). Defendant signed the advice of rights and waiver form, and Officer Harris signed the form as a witness. (Id.). The Miranda portion of the interview lasted approximately five minutes. (Tr. at 74). TFO Fisher interviewed Defendant, which took approximately twenty minutes, and Defendant was responsive to the TFO's questions. (Tr. at 73-74). Neither TFO Fisher nor Officer Harris threatened Defendant or made any promises to him. (Tr. at 74). Defendant did not appear to be under the influence of drugs or alcohol; his speech was coherent; he

AO 72A

(Rev.8/82)

appeared to understand the questions; and he did not refuse to answer questions or ask for a lawyer. (Tr. at 73-75). The officers' firearms were holstered at all times during the interview. (Tr. at 69-70).

After the interview, handcuffs again were placed on Defendant, and he walked into the living room where he sat down in a chair. (Tr. at 33, 75). PO Sims was in the living room at the time, and Defendant began making statements to her about the firearms recovered from his bedroom. (Tr. at 33). PO Sims testified:

> He stated that he knew that his girlfriend had one of the guns. He did not know that she left the guns because she had left for that day to go run some errands or whatever she was doing for that day. But he did state that he did know that his girlfriend had a gun and he stated that the other gun came from his girlfriend and was supposed to be a Christmas gift for him. . . . He stated that he wanted to have the firearm because of issues that had happened in the home. He stated that he recently had kicked his brother out of the home because his brother was addicted to drugs. And for safety purposes for his aunt. . . . [H]e wanted to make sure that he could protect his aunt and himself.

(Tr. at 33-34). PO Sims did not ask Defendant any questions to prompt the statements about the firearms. (Tr. at 33). Defendant began talking on his own. (Id.). Neither PO Sims nor any other officer in the living room threatened Defendant or made any promises to him. (Tr. at 35). The officers' firearms were holstered while Defendant made these statements. (Id.).

12

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.    Discussion

In his post-hearing brief in support of the motion to suppress evidence, Defendant challenges the warrantless search of his residence, Apartment A-1 at 50 Mt. Zion Road in Atlanta. [Doc. 20 at 4-8]. Defendant contends that the officers were required to have a reasonable suspicion to support the search and that the facts did not establish a reasonable suspicion. [Doc. 20 at 4-8]. As noted *supra*, the Government opposes the motion to suppress contending that no reasonable suspicion was required in this case for the search of the apartment and that even if reasonable suspicion was required, the facts establish a basis for the search. [Doc. 21].

In <u>Samson</u>, the Supreme Court first affirmed that when resolving challenges under the Fourth Amendment, courts "'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." 126 S. Ct. at 2197 (citation omitted). The Court then discussed the holding in <u>United States v. Knights</u>, 122 S. Ct. 587 (2001), in which the Court upheld the warrantless search of a probationer's apartment based on a reasonable suspicion of criminal activity and on a condition of supervision providing for a warrantless

13

search. <u>Samson</u>, 126 S. Ct. at 2197. The Court noted that, balancing the significantly diminished expectation of privacy held by the probationer against the legitimate governmental interests served by probation searches, "we held that '[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.'" <u>Id.</u> at 2198 (quoting <u>Knights</u>, 122 S. Ct. at 592). However, the Court noted that under the circumstances of that case, "we did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation." <u>Id.</u> at 2198 (citation omitted). That question was resolved, in the context of a parolee search, by the Court in <u>Samson</u>. <u>Id.</u>

First, the Court noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." <u>Id.</u> Second, "as [the Court] found 'salient' in <u>Knights</u> with respect to the probation search condition, the parole search condition under California law-requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer 'at any time,' . . . was 'clearly expressed' to [the defendant]." <u>Id.</u> at 2199 (citations omitted). Accordingly, the Court stated:

AO 72A
(Rev.8/82)

"Examining the totality of the circumstances pertaining to [the defendant's] status as a parolee, 'an established variation on imprisonment,' . . . including the plain terms of the parole search condition, we conclude that [the defendant] did not have an expectation of privacy that society would recognize as legitimate." Id. (citations omitted).

Compared to a parolee's lack of a reasonable expectation of privacy under these conditions, the Court stated:

> The State's interests, by contrast, are substantial. This Court has repeatedly acknowledged that a State has an "'overwhelming interest'" in supervising parolees because "parolees . . . are more likely to commit future criminal offenses." . . . Similarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.

126 S. Ct. at 2200 (citations omitted). The court found that "California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society." Id. at 2200. For the reasons cited, the Supreme Court "conclude[d] that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Id. at 2202.

15

In the present case, Defendant acknowledges that a parolee has a reduced expectation of privacy. [Doc. 20 at 4-5]. However, Defendant argues that his expectation of privacy was greater than that of the parolee in <u>Samson</u> because the policies of the Georgia Board of Pardons and Paroles provide that parole officers conducting warrantless searches of parolees must have "a reasonable suspicion that the parolee is engaged in new criminal conduct or in violation of his conditions of parole. . . ." [Doc. 20 at 5]. Defendant notes that the Field Operations Manual for the Board sets forth the policies that parole officers should follow in supervising parolees. (Tr. at 15-16, Def. Ex. 1). The policy covering searches provides that "[t]he search of a parolee's 'person, papers, place of residence, automobile or any other property' should be conducted only after 'reasonable suspicion' have been established." (Tr. at 16, Def. Ex. 1).

Defendant contends that based upon the published policies of the Georgia Board of Pardons and Paroles governing the searches of parolees' residences, he had an expectation of privacy to be free from searches that are not based on a reasonable suspicion. [Doc. 20 at 5, 8]. Defendant asserts that the search of his residence on December 13, 2010, was conducted by PO Sims and other officers not because they had a reasonable suspicion that he was engaged in criminal activity but because they

16

were conducting a sweeping detail visiting all of the parolees on PO Sims' caseload in Zone 3. [Doc. 20 at 8]. According to Defendant, the search was a violation of the policies of the Board of Pardons and Paroles because PO Sims did not have reasonable suspicion.[5] [Doc. 20 at 8]. Thus, Defendant argues that the two firearms seized from his residence during the search on December 13, 2010, must be suppressed. The court finds Defendant's arguments unpersuasive.

Based on the totality of the circumstances, the court concludes that Defendant Robinson "did not have an expectation of privacy that society would recognize as legitimate." Samson, 126 S. Ct. at 2199. And the State of Georgia has a substantial counterbalancing interest in taking the necessary measures, including conducting suspicionless searches of parolees, to reduce recidivism and assist in reintegration of parolees into society. Id. at 2200. Defendant's rights under the Fourth Amendment were not violated by the search of his apartment.

---

[5]Defendant also argues that the search was a violation of the policies of the Board because PO Sims did not have permission from the Chief Parole Officer to conduct the search. [Doc. 20 at 8]. The manual provides, "The Chief Parole Officer or designee must approve and coordinate any search with the exception of a Stop and Frisk search and searches incident to arrest." (Tr. at 16, Def. Ex. 1). PO Sims, however, testified that prior to the detail, her supervisor, Chief Felicia Holloway, approved of officers conducting searches of the residences of all of Sims' parolees residing in Zone 3. (Tr. at 45-46).

AO 72A

(Rev.8/82)

On or about September 30, 2009, Defendant was released from prison and placed on parole. (Tr. at 5-8; Gov't Exs. 1 and 2). Defendant met with PO Hawkins on October 1, 2009, to review, acknowledge, and execute the conditions and instructions governing his parole. (Tr. at 5-11, Gov't Exs. 1 and 2). One of the standard conditions of his parole, which Defendant was required to acknowledge and agree to in order to remain on parole, provided: "My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control."[6] (Tr. at 9, Gov't Ex. 1). PO Hawkins then reviewed with Defendant the acknowledgment and certification portion of the parole certificate. (Tr. at 10, Gov't Ex. 1). As witnessed by PO Hawkins, Defendant signed the acknowledgment of conditions of release which provided in part, "I have read or have had read to me the above standard Parole conditions[.]" (Tr. at 8-11, Gov't Ex. 1). On December 13, 2010, subject to the search provision, PO Sims and other officers from the Georgia Board of Pardons and Parole,

---

[6]This is the same condition that the Eleventh Circuit Court of Appeals in United States v. Stewart, 213 Fed. Appx. 898 (11th Cir. 2007), and the District Court in the Middle District of Alabama in United States v. Brown, 2009 WL 112574 (M.D. Ala. January 15, 2009), applied to uphold a warrantless search of a Georgia parolee's residence pursuant to Samson.

the Department of Corrections, and the APD participated in a search of Defendant's residence, Apartment A-1 at 50 Mt. Zion Road in Atlanta. (Tr. at 23-25).

Despite his awareness of and agreement to the standard condition of parole requiring him to submit to a warrantless search "at any time," Defendant argues that officers nevertheless were required to have reasonable suspicion before searching his residence based on the Field Operations Manual for the Georgia Board of Pardons and Paroles. [Doc. 20 at 8]. Defendant contends that the policies contained in the manual constitute "the applicable law in Georgia" which made it reasonable for him to "expect that he would be free from a warrantless search of his residence absent a reasonable suspicion to believe he had contraband. . . ." [Doc. 20 at 5]. But as the Government correctly points out, the Field Operations Manual sets forth a set of policies drafted by the Georgia Board of Pardons and Paroles, not the Georgia legislature, and does not carry the force of law. Given Defendant's agreement to warrantless and suspicionless searches as a condition of his release on parole, the court finds that Defendant lacks a reasonable expectation of privacy to challenge the search of his residence under the Fourth Amendment, irrespective of the policies set forth in the Field Operations

AO 72A

(Rev.8/82)

Manual.[7] See Samson, 126 S. Ct. at 2199; Stewart, 213 Fed. Appx. at 899 ("Because Stewart's parole certificate required him to submit to a search 'at any time' without a warrant, the [warrantless and suspicionless] search was authorized by the terms of Stewart's parole conditions."); United States v. Wilcher, 2010 WL 5678676, at *4 (N.D. Ga. December 17, 2010) ("Under these circumstances, the conditions of Defendant's release so diminished his expectation of privacy, that even a suspicionless search does not violate the Fourth Amendment."). And, in light of the State's substantial interest in supervising parolees, under the totality of the circumstances, the searches were reasonable under the Fourth Amendment. Samson, 126 S. Ct. at 2202. Therefore, the items seized from Defendant's apartment are admissible in evidence.

Because the court concludes that under Samson the warrantless search of Defendant's apartment did not violate the Fourth Amendment regardless of whether the officers had reasonable suspicion, the court will only briefly address the Government's alternative argument that reasonable suspicion existed. By the time of the December 2010 search in this case, Defendant, who had been convicted of various

---

[7]For this reason, as did the Supreme Court in Samson, this court declines to reach the issue of whether Defendant's execution of the standard conditions of parole constituted a waiver of - or a consent to waive - his Fourth Amendment rights. 126 S. Ct. at 2199 n.3.

State of Georgia felony drug offenses, robbery by intimidation, and possession of a firearm by a convicted felon, tested positive for illegal drug use on at least three occasions, the last one being in October 2010. (Tr. at 5-8, 41-43, Gov't Exs. 1 and 2). The Government notes that the Field Operations Manual for the Georgia Board of Pardons and Paroles cites a positive drug test as an example of reasonable suspicion. (Def. Ex. 1). Defendant was verbally reprimanded for changing his residence of record without permission from his parole officer in or around June 2010. (Tr. at 24-25). Defendant also failed to pay the required parole supervision fee of $30 per month and failed to complete a recommended substance abuse program. (Tr. at 44-45, Gov't Exs. 1 and 2). Given the fact that these actions constituted violations of the conditions of Defendant's parole, the court finds that PO Sims and the other officers did have "'a sufficiently high probability that criminal conduct [was] occurring to make the intrusion on [Defendant's] privacy interest reasonable.'" United States v. Walley, 271 Fed. Appx. 966, 968 (11th Cir. 2008) (citation omitted); see also United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005) (examining application of the Fourth Amendment to the search of a probationer's computer, when there is no search provision in terms of release, and finding that a reasonable suspicion, that is, "'look[ing] at the totality of the circumstances . . . to see whether the detaining officer

21

has a particularized and objective basis for suspecting legal wrongdoing[,]'" satisfies the balancing test) (citation omitted).

Accordingly, it is **RECOMMENDED** that Defendant's motion [Doc. 9] to suppress evidence be **DENIED**.

### III.  Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 10] to suppress statements and motion [Doc. 9] to suppress evidence be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 22nd day of November, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A

(Rev.8/82)